IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

LONNIE REED                                                                    PETITIONER

NO. 4:22CV00816 DPM-JJV

DEXTER PAYNE, DIRECTOR,
ARKANSAS DIVISION OF
CORRECTION                                                                  RESPONDENT

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Lonnie Reed, petitions the Court for a writ of habeas corpus under 28 U.S.C. §2254 on the ground that he is in the custody of the Arkansas Division of Correction pursuant to convictions for aggravated robbery (two counts) and theft of property (one count), plus a sentencing enhancement for use of a firearm during the commission of a felony, for a total sentence of fifty-five (55) years in prison, all imposed in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## Background of the Case

On August 9, 2016, the petitioner, Lonnie Reed, was charged in a Felony Information with two counts of aggravated robbery and one count of theft of property. The State also alleged that Reed used a firearm in the commission of a felony and accordingly sought a sentencing enhancement based on that.

Reed was represented by a public defender, and his case proceeded to a jury trial on September 11, 2018. The State's entire evidence against Reed consisted of a partial fingerprint on a plastic basket, with a different individual's print imposed over it. Neither the pharmacy manager (Kent Vincent) nor the Little Rock Police Department detectives (after reviewing the video surveillance from the interior of the pharmacy) could identify this plastic basket as the plastic basket that was handled by the robber. Reed presented an alibi

1

defense.

The State's theory was that on July 6, 2016 at 6:47 p.m., Reed entered the Express RX drugstore on Cantrell Road in Little Rock and robbed the pharmacy of dilaudid and oxycodone. Reed's alibi defense placed him at 6:40 p.m. (actually, more than likely a few minutes after that before he left) on that date at 16717 MacArthur Drive in North Little Rock, which was a tire store where Reed had purchased tires and had them placed on his vehicle. Detective Stephanie Rector testified about the time, and she stated that the suspect was recorded entering the pharmacy and 6:47 p.m. and was recorded fleeing the pharmacy on foot at 6:52 p.m.

The jury convicted Reed of two counts of aggravated robbery and theft of property. He was sentenced to a total of fifty-five (55) years in prison. Reed's direct appeal was affirmed on January 29, 2020. *Reed v. State,* 2020 Ark. App. 49, 595 S.W.3d 391 (2020), and the mandate issued on February 28, 2020.

Reed then sought post-conviction relief under Ark. R. Crim. P. 37 in the Pulaski County Circuit Court. His Rule 37 petition was properly and timely filed on March 28, 2020. The circuit court denied relief without a hearing, and the Arkansas Court of Appeals affirmed on October 6, 2021 in *Reed v. State,* 2021 Ark. App. 371 (2021). On November 29, 2021, Reed filed a Motion to File Belated Petition for Review, and the Arkansas Supreme Court granted that motion on January 27, 2022. The Arkansas Supreme Court denied Reed's *pro se* petition for review on March 31, 2022.

Reed's state remedies are exhausted, and this "protective"/"placeholder" habeas petition is timely filed under the AEDPA.

## Standard of Review Under the AEDPA

Reed first notes the standard of review that applies in this federal habeas corpus case. Under 28 U.S.C. §2254(d), claims that were "adjudicated on the merits" in the state courts are subject to a deferential standard of review. Under §2254(d), habeas relief may be granted on such claims if the last reasoned decision in the state courts was (1) contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" (§2254(d)(1)) or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (§2254(d)(2)). An "unreasonable" application of federal law is different from an "incorrect" application of federal law. *Renico v. Lett,* 559 U.S. 766, 773 (2010). "[A]n unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall,* 572 U.S. 415, 419 (2014). In *Harrington v. Richter,* the Court explained:

> Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.

*Harrington v. Richter,* 562 U.S. 86, 99 (2011). The 8th Circuit has also held that "in examining whether the state court's decision involved an unreasonable application of clearly established federal law, we examine the ultimate legal conclusion reached by the court, not merely the statement of reasons explaining state court's decision." *Williams v. Roper,* 695 F.3d 825, 831 (8th Cir. 2012).

However - and of particular importance to Reed's case - the Supreme Court has also held: "That the standard is stated in general terms does not mean the application was

reasonable." *Panetti v. Quarterman,* 551 U.S. 930, 950 (2007).   The Court went on to

reason:

> AEDPA does not "require state and federal courts to wait for some nearly
> identical factual pattern before a legal rule must be applied." *Carey v.
> Musladin,* 549 U.S. __, __ (2006) (slip op., at 2) (Kennedy, concurring
> judgment).   Nor does AEDPA prohibit a federal court from finding an
> application of a principle unreasonable when it involves a set of facts
> "different from those of the case in which the principle was announced."
> *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003).   The statute recognizes, to the
> contrary, that even a general standard may be applied in an unreasonable
> manner.   *See, e.g., Williams v. Taylor,* 529 U.S. 362 (finding a state-court
> decision both contrary to and involving an unreasonable application of the
> standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984)).   These
> principles guide a reviewing court that is faced, as we are here, with a record
> that cannot, under any reasonable interpretation of the controlling legal
> standard, support a certain legal ruling.
>
> Under AEDPA, a federal court may grant habeas relief, as relevant, only if the
> state court's "adjudication of [a] claim on the merits . . . resulted in a decision
> that . . . involved an unreasonable application" of the relevant law.   When a
> state court's adjudication of a claim is dependent on an antecedent
> unreasonable application of federal law, the requirement set forth in
> §2254(d)(1) is satisfied.   A federal court must then resolve the claim without
> the deference AEDPA otherwise requires.   *See Wiggins v. Smith,* 539 U.S. 510,
> 534 (2003) (performing the analysis required by under *Strickland'*s second
> prong without deferring to the state court's decision because the state court's
> resolution of *Strickland'*s first prong involved an unreasonable application of
> law); *id.,* at 527-529 (confirming that the state court's ultimate decision to
> reject the prisoner's ineffective-assistance-of-counsel claim was based on the
> first prong and not the second).   See also *Williams, supra,* at 395-397; *Early
> v. Packer,* 537 U.S. 3, 8 (2002) (*per curiam*) (indicating that §2254 does not
> preclude relief if either "the reasoning or the result of the state-court decision
> contradicts [our cases]").

*Id.* at 950-951.   The Court in *Panetti* went on to find: "Here, due to the state court's

unreasonable application of *Ford,* the factfinding procedures upon which the court relied

were "not adequate for reaching reasonably correct results" or, at a minimum, resulted in a

process that appeared to be "seriously inadequate for the ascertainment of the truth."   477

U.S., at 423-424 (Powell, J., concurring in part and concurring judgment) (internal quotation

marks omitted).   We therefore consider petitioner's claim on the merits and without deferring

to the state court's finding. . . ." *Id.* at 951.

In Reed's case, the Arkansas Court of Appeals' decision in his Rule 37 proceedings involved an unreasonable application of clearly established federal law relating to the right to effective assistance of counsel on direct appeal and the right to only be convicted of a crime based on proof beyond a reasonable doubt. The state court's decision is also based on an unreasonable determination of the facts as established in the state court record. Both §2254(d)(1) and (2) are satisfied. On the merits, Reed is entitled to habeas corpus relief because the State's proof, based solely on a partial print overlaid with another foreign print on a moveable object that cannot be identified as the moveable object (plastic basket) used in the commission of the crime, is insufficient under the Due Process Clause of the Fourteenth Amendment to support Reed's convictions. Also on the merits, appellate counsel was ineffective in violation of the Fifth, Sixth, and Fourteenth Amendments for abandoning this glaringly meritorious issue in favor of an argument that stood no chance of success.

## Claims for Relief

### I.

**REED WAS DENIED HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL. FURTHER, THE ARKANSAS COURT OF APPEALS' DECISION IS "UNREASONABLY WRONG" UNDER THE AEDPA.**

Reed first asserts that his appointed counsel on direct appeal was ineffective in violation of the Fifth, Sixth, and Fourteenth Amendments. Specifically, appellate counsel unreasonably abandoned a meritorious sufficiency-of-the-evidence argument in favor of an argument related to a jury instruction that had virtually no chance at all of success.

Reed first notes the standard for evaluating claims of ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court recognized that the

right to effective assistance is essential to protect the fundamental right to a fair trial. *Id.* at 684-685. To prevail on a claim of ineffective assistance, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687. Counsel's performance is held to the standard of reasonable professional assistance, and he has a duty to bring "such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688. To succeed on an ineffective assistance claim, an applicant for post-conviction relief must show that counsel's performance fell below an "objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 688, 696. *See also Williams v. Taylor,* 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510 (2003). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Johnson v. Lockhart,* 921 F.2d 796 (8th Cir. 1991).

> With the prejudice test, we evaluate the outcome of the proceeding in question. The ineffective performance must create a reasonable probability that the result of the proceeding is unreliable; the ineffectiveness must undermine our confidence in the proceeding. This means more than just a conceivable effect on the outcome but something less that the oft used "more likely than not" or preponderance standards.

*Kenley v. Armontrout*, 937 F.2d 1298, 1301 (8th Cir. 1991).

The standard for ineffective assistance of appellate counsel claims is basically the same as the Supreme Court in *Strickland* set out. The constitutional right to effective assistance of appellate counsel is well settled. *Evitts v. Lucey,* 469 U.S. 387 (1985). Once counsel has undertaken the appeal, he has the duty "to support his client's appeal to the best of his ability." *Anders v. California,* 386 U.S. 738, 744 (1967). Although there is no duty to argue every "colorable" issue in the case, when counsel fails to raise an issue that would have called for reversal, he fails to render effective assistance. *Jones v. Barnes,* 463 U.S. 745

(1983); *McCoy v. Court of Appeals of Wisconsin, Dist. 1,* 486 U.S. 429 (1988).

The courts have also stated that the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy." *See Smith v. Murray,* 477 U.S. 527, 537 (1986); *Jones v. Barnes, supra.* That is not what happened in Reed's case, however. In fact, the opposite happened.

As noted above, the State's entire case against Reed at trial was based on a partial fingerprint found on one of the three plastic baskets used by the pharmacy to dispense prescriptions. The police had lifted eight (8) sets of unidentified latent prints from the scene. Those prints were collected from (1) a counter top near the pharmacy register, (2) the interior and exterior glass of the pharmacy's front doors, and (3) three green plastic medicine baskets in the pharmacy. After committing the crime, the robber exited the pharmacy through the front glass door, carrying one of the baskets. However, he discarded the basket on the floor of the pharmacy before he exited out the door. Video surveillance of the crime shows the masked robber placing his left hand on the interior glass of the front door to push it open so he could exit the pharmacy. Further, the palm print (E1G1) and fingerprint (E1H1) lifted from this exact location of the pharmacy door do not belong to or match those of Lonnie Reed. (The robber was not wearing gloves.)

Immediately after the robbery, the pharmacy manager (Kent Vincent) picked up the basket and placed it behind the counter. It is at this time that Vincent went into his normal routine of "cleaning up" the business. Ultimately, Vincent co-mingled the plastic basket with the other plastic baskets behind the counter, thus rendering him and the detectives unable to identify which basket was discarded by the robber. According to the proof presented by the State at Reed's trial, Reed's right middle fingerprint was found on the bottom of one of those baskets. The print was overlaid with another fingerprint, and the State never presented any

evidence showing who that print belonged to. There was no eyewitness identification of Reed as the perpetrator and the video surveillance does not establish Reed's guilt or identify Reed as the robber. In fact, video surveillance of the robber placing his left hand on the interior glass of the pharmacy door and the palm and fingerprint lifted from this exact location is exculpatory to Reed. There was no other evidence suggesting that Reed was involved in the commission of this crime. Testimony presented by the State at trial regarding fingerprint evidence showed the following:

1. Some surfaces are more conducive to latent print retention than others, and glass is a "wonderful" surface for retaining fingerprints;

2. A person does not always leave a fingerprint when touching an item or location;

3. There is no known way to determine the "age" of a fingerprint;

4. A fingerprint can last for years or can be wiped away in a matter of seconds; it all depends on what happened to that surface since the print was left;

5. There was no way to determine how long Reed's fingerprint had been on the basket;

6. The palm print lifted (E1G1) lifted from the interior glass of the front door of the pharmacy did not belong to Reed;

7. There are three different levels of detail when analyzing a fingerprint to determine if it is sufficient to use for comparison purposes. The Level One detail has three basic pattern types: Whorls, loops, and arches. Print E1D3 on the State's latent print worksheet is marked "X Arch" but the State's "expert" was unable to see whether this was a whorl, an arch, or a loop;

8. There is no such thing as a "full fingerprint" because it is physically impossible to record one hundred percent of ridge detail from ridged skin to non-friction ridged skin.

Level Two detail goes to the actual ridge units – the ridges themselves.  Level Three looks at the ridge unit itself;

9.  The known prints taken from Reed had spaces in between, so there are incomplete parts and there are also some air bubbles so that small areas of the print will be missed;

10.  On the E1D3 lift, there are two prints, one on top and one on bottom and it is impossible to determine which print was placed there first;

11.  There are known examples of fingerprint mistakes; and

12.  The State's expert acknowledged that in her expert opinion, and with an object in regular use, friction would wipe away part of and/or some of the print(s) on that object.

The United States Supreme Court has apparently never addressed the question of the sufficiency of the evidence in this very specific factual scenario - a scenario where a defendant was convicted of a crime and the *only* proof that the defendant was even at the scene of the crime was a partial fingerprint, layered with the partial fingerprint of another individual (i.e., on a moveable object (i.e., a plastic basket) that cannot be identified as the moveable object used in the commission of the robbery)).  That, however, is not dispositive (or even relevant) under *Panetti v. Quarterman, supra.*  It does not appear that the Eighth Circuit has ever addressed a situation precisely like this one, either.  However, multiple other federal circuit courts of appeals have addressed the issue and agreed with the position currently taken by Reed in this habeas case.

For example, in *Mikes v. Borg,* 947 F.2d 353 (9th Cir. 1991), the Ninth Circuit held:

The clear principle arising from the cases decided by our fellow circuits is that, in a case resting upon the premise that the defendant impressed his fingerprints on an object at the time of the commission of the crime and supported solely by evidence that the defendant's fingerprints were found on that object, the record must contain sufficient evidence to permit a jury, applying the beyond a reasonable doubt standard, to draw the inference that the defendant touched the object *during the commission of the crime.*  That is a principle that we ourselves acknowledged on more than one occasion, *see [United States v.] Talbert,* 710 F.2d at 530-31 (9th Cir. 1983); *[United States v.] Scott,* 452 F.2d at 662 (9th Cir. 1972), and that we reiterate today.  Accordingly, in the case before us, the evidence in the record must be sufficient to justify a reasonable factfinder's conclusion that the posts were not accessible to the defendant during the relevant period (here, the period shortly before Hansen's acquisition of them).  The record falls far short of meeting that standard.

. . .

But, in a case in which the prosecution's theory is that the defendant's fingerprints were placed on the murder weapon at the time of the commission of the crime or were left at the scene of the crime during its commission, the record must show that the object was inaccessible to the defendant or that the defendant did not have access to the crime scene, during the relevant period prior to the crime's commission.

*See also United States v. Strayhorn,* 743 F.3d 917 (4th Cir. 2014), where the Fourth Circuit

held:

The probative value of an accused's fingerprints upon a readily moveable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime.  Such timing evidence was lacking Regarding the rest of the government's evidence, we explained that some was without probative value and that the rest constituted an accumulation of purely circumstantial evidence that was insufficient to permit the jury to find the defendant guilty beyond a reasonable doubt.

. . . .
To warrant conviction the trier of fact must be able to reasonably infer from the circumstances that the fingerprints were impressed at the time the crime was committed.  But the government had failed to show when the fingerprints were imprinted on these moveable objects.  For this reason the prosecution rested on conjecture and suspicion, and the jury could only have guessed that the imprinting occurred during the commission of the crime.

*Accord, Hiet v. United States,* 365 F.2d 504 (D.C. Cir. 1966): *Borum v. United States,* 380

F.2d 595 (D.C. Cir. 1967); *United States v. Garside,* 426 F.2d 939 (6th Cir. 1970); *United*

*States v. Corso,* 439 F.2d 956 (4th Cir. 1971); *United States v. Van Fossen,* 460 F.2d 38 (4th Cir. 1972); *United States v. Lonsdale,* 577 F.2d 923 (5th Cir. 1978); *United States v. Collon/Garside,* 426 F.2d 939 (6th Cir. 1970). *See also United States v. Bratten,* U.S.D.C. No. TDC 17-363 (E.D. Md. June 25, 2018) and *Monzo v. Edwards,* 281 F.3d 568 (6th Cir. 2002). In *Monzo,* the Sixth Circuit explained:

> Monzo claimed his finger prints could be explained because he had worked for Jack Travis, a contractor who had renovated part of Groseck's house. Monzo testified that he had been in the house at least ten times, including three or four times during 1987, to perform remodeling work and odd jobs for Travis. He said he was paid in cash for the odd jobs and may have touched Groseck's wallet when handling it to her so that she could pay him. The fingerprint expert testified, however, that the fingerprint from the wallet was relatively fresh because . . . no over lapping prints were found on the print lifted from Groseck's wallet.

Thus, the overlapping print found on the print lifted from the plastic basket confirms that Reed's print (assuming it is, in fact, Reed's print) was not fresh and had been on the basket for an indeterminable amount of time.

Reed believes that *Bratten* is particularly on point and must be reviewed. Therefore, a copy of the court's decision in that case is attached to this amended petition for the Court's convenience.

In sum, this is a meritorious - and winning -issue in Lonnie Reed's case. There is no legitimate "strategic" or "tactical" reason for appellate counsel to completely abandon the issue in favor of an argument regarding a jury instruction (an argument that called for appellate review under a circuit-court-friendly "abuse of discretion" standard). The chances of success on direct appeal with that argument were virtually nil, while the chances of success on a well-supported sufficiency-of-the-evidence argument were excellent.

Appellate counsel was thus ineffective. Both prongs of the standard are satisfied. Further, the Arkansas Court of Appeals' decision on Reed's ineffective-assistance-of-

11

appellate-counsel argument in his Rule 37 proceedings involves an unreasonable application of clearly established federal law (namely, *Jackson v. Virginia,* 443 U.S. 307 (1979) and *Strickland v. Washington,* 466 U.S. 668 (1984)).   It is also based on an unreasonable determination of the facts under 28 U.S.C. §2254(d)(2).

More specifically for this Court to answer: The Arkansas Court of Appeals stated that "the existence of another fingerprint could be explained by Vincent's clean-up efforts after the robbery. . . ." At trial "Vincent was asked: "Normally, how would you grasp a basket?" His response was "I would generally pick it up from the side if that's - if that helps." Vincent's own testimony removes "explanation" that his own print overlaps Reed's print. *See Turner v. State,* 103 Ark. App. 248.  *Turner* shows that the Arkansas Court of Appeals has previously ruled on the merits of "fingerprint-only" evidence on a highly "moveable object.  The court held that when the State's case is made entirely of circumstantial evidence, it if leaves the fact-finder with speculation and conjecture the evidence is insufficient as a matter of law.  *Turner* also shows that if Reed's court-appointed appellate counsel had argued the strongest issue (insufficiency of the evidence) on direct appeal instead of a significantly weaker issue that called for appellate review under a circuit court-friendly "abuse of discretion" standard, it is almost certain that Reed's conviction would have been reversed and dismissed on direct appeal.

Reed's entire judicial experience - at trial and on direct appeal - has been marred by the failings of both trial counsel, appellate counsel, and the courts.  Reed now has to resort to the extraordinary measure of attempting to navigate through the minefield of "post-conviction" to seek redress.  To deny Reed the Great Writ would be to further deny justice to Reed and his family.

This Court should accordingly grant habeas relief on this claim.

## II.

## THE STATE'S PROOF IS CONSTITUTIONALLY
## INSUFFICIENT TO SUPPORT REED'S CONVICTIONS.

In habeas cases, a claim challenging the sufficiency of the evidence to support a state court conviction is governed by the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). In that case, the Supreme Court held that due process under the Fourteenth Amendment guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Id.* at 315. The Court thus held that the standard in habeas review of this type of claim is whether, viewing the evidence in the light most favorable to the prosecution, the record shows that any rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id.* at 318-319, 324.

In this case, the *Jackson* test is satisfied. For all the reasons set out above in Claim I, the State presented constitutionally insufficient proof that Lonnie Reed was the perpetrator of the crimes for which he was convicted.

The Court should grant the Great Writ on this claim and order Reed unconditionally discharged. *See Burks v. United States,* 437 U.S. 1 (1978) (holding that the prosecution is only entitled to "one fair opportunity" to prove its case against a defendant).

## Conclusion

For these reasons and based on these authorities, the Court should grant the Great Writ and order Lonnie Reed unconditionally discharged from his unconstitutional confinement.

Respectfully submitted,


Craig Lambert
Craig Lambert
Ark. Bar No. 87100
P.O. Box 839
Heber Springs, AR 72543
(501) 374-3559
wclambert@aol.com

*Counsel for Lonnie Reed*

**United States v. Bratten**
United States District Court, D. Maryland.    June 25, 2018    Not Reported in Fed. Supp.    2018 WL 3117541    *(Approx. 7 pages)*

2018 WL 3117541
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

UNITED STATES of America

v.

Joseph Lowell BRATTEN, Defendant.

Criminal Action No. TDC-17-0363
Signed 06/25/2018

**Attorneys and Law Firms**

Ray Daniel McKenzie, Thomas M. Sullivan, Office of the United States Attorney,
Greenbelt, MD, for United States of America.

Michael T. Citaramanis, Office of the Federal Public Defender, Greenbelt, MD, Patricia L.
Richman, Office of the Federal Public Defender, Baltimore, MD, for Defendant.

**MEMORANDUM OPINION**

THEODORE D. CHUANG, United States District Judge

*1 Defendant Joseph Lowell Bratten is charged with Attempt to Interfere with Interstate
Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) (Count One); Interference with
Interstate Commerce by Robbery, also in violation of 18 U.S.C. § 1951(a) (Count Two);
and Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of
Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three). After four days of trial
beginning on February **20**, 2018, and three days of deliberations, a jury was unable to
reach a verdict, and the Court declared a mistrial on March 1, 2018. On April 9, 2018,
Bratten filed a Motion for Judgment of Acquittal, the briefing on which was completed on
May 14, 2018. Having reviewed the submitted materials, the Court finds that no hearing is
necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion is
GRANTED.

**BACKGROUND**

On January 18, 2017 at approximately 7:00 p.m., a masked man carrying a gun entered
the Shell Gas Station/Dash-In ("Shell") located at 9220 S.E. Crain Highway in Upper
Marlboro, Maryland, jumped over the counter, demanded money from the cashier, and,
when the cashier confronted him, struck the cashier on the head and fled without taking
any funds from the store. Later that evening, at approximately 8:00 p.m., a masked man
carrying a gun entered the Circle K convenience store ("Circle K") located at 3511 Crain
Highway, Upper Marlboro, Maryland, jumped over the counter, demanded money from the
cashier, and fled carrying a cash register drawer. Upon arrival at the Circle K, the Prince
George's County Police Department ("PGCPD") recovered an unopened pack of Newport
cigarettes from the part of the parking lot through which the robber had fled and lifted a
latent fingerprint from the pack. A PGCPD fingerprint examiner conducted an analysis of
the print and concluded that it matched a known fingerprint of Bratten's right thumb.

At trial, the Government called 11 witnesses who testified to various aspects of the case.
Beshar Jumale, the store clerk working at the Shell on the night of the robbery, and Suraj
Bishwokarma, the Circle K store clerk, explained in detail how each robbery was
conducted, but neither witness identified Bratten as the robber. Through these witnesses,
the jury was shown security camera footage of each robbery. The videos showed that the
robbers wore different outer sweatshirts or jackets, but the Government pointed out
various similarities between the robbers and their actions, including that each wore
underwear of the same color and similar sneakers with red trim; each carried in his left
hand a distinctive black firearm with a skinny barrel; and each made similar movements,
including stepping onto the counter with his left foot in order to get behind the counter
and trying to cover his hands with the sleeves of his jacket before handling the cash

## I. Legal Standard

*3 In reviewing a Motion for Judgment of Acquittal under Rule 29, the Court determines whether, viewing the evidence in the light most favorable to the prosecution, there was substantial evidence to support the jury's verdict. *United States v. Osborne,* 514 F.3d 377, 385 (4th Cir. 2008). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* To sustain the verdict, the Court must conclude that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Madrigal-Valadez,* 561 F.3d 370, 374 (4th Cir. 2009) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) ). In doing so, the Court must consider both circumstantial and direct evidence. *United States v. Tresvant,* 677 F.2d 1018, 1021 (4th Cir. 1982). The Court does not weigh the credibility of witnesses, but instead must assume that the jury has resolved all contradictions in the Government's favor, *United States v. United Med. & Surgical Supply Corp.,* 989 F.2d 1390, 1402 (4th Cir. 1993), and give the Government "the benefit of all reasonable inferences from the facts proven to those sought to be established," *Tresvant,* 677 F.2d at 1021.

## II. Fingerprint Evidence

It is undisputed that the presence of Bratten's fingerprint on the Newport cigarette pack was the only evidence presented by the Government to connect Bratten to robberies. No witness identified Bratten as the perpetrator of either robbery, and the varying descriptions of the robber, with heights ranging from 5' to 5' 9", were wholly inadequate to connect Bratten to the crime. The Government did not argue that the robbers depicted in the surveillance videos could be identified as Bratten. No evidence was presented that Bratten had ever been seen wearing any articles of clothing similar to those worn by the robber, or in possession of Newport cigarettes. The Government offered no evidence about Bratten's background, such as whether he had ever visited either convenience store, whether he lived or worked in the area, or whether he resided in Maryland. The Government did not even establish whether Bratten was right-handed or left-handed.

When the Government's case rests on a lone fingerprint, courts have carefully considered motions for judgment of acquittal. In *United States v. Strayhorn,* 743 F.3d 917 (4th Cir. 2014), the United States Court of Appeals for the Fourth Circuit held that "a fingerprint on an easily movable object with no evidence of when it was imprinted is sufficient to support a conviction only when it is accompanied by additional incriminating evidence." *Id.* at 924. In *Strayhorn,* two defendants allegedly robbed a store at gunpoint and bound the store's owner with duct tape. *Id.* at 920. The Government's main evidence against Strayhorn was a partial fingerprint on the duct tape used to bind the victim's feet that matched Strayhorn's fingerprint. *Id.* at 921-22. However, the Government's fingerprint examiner expert witness "conceded that he had no way to determine when [the defendant's] fingerprint was imprinted ... and that the fingerprint could have been impressed even a year earlier." *Id.* at 923. The Fourth Circuit concluded that even with additional evidence in the case, including that a gun stolen during the robbery was found in a car driven by the defendant, and that one of the robbers was the defendant's brother and was therefore someone with whom he was associated, judgment of acquittal was warranted. *Id.* at 923-24.

In *United States v. Corso,* 439 F.2d 956 (4th Cir. 1971), the Fourth Circuit held that "[t]he probative value of an accused fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime." *Id.* at 957. In *Corso,* the fingerprint of a defendant charged with larceny of a credit union was found on a matchbook cover used to jam a lock at the financial institution. *Id.* As in *Strayhorn,* the Government's expert "testified that it was impossible to determine how long defendant's fingerprints had been on the matchbook cover and admitted they could have been placed there months before the burglary." *Id.* The court overturned the defendant's conviction, noting that the only other evidence relating to the defendant, that he worked near the credit union, was not enough to support a conviction. *Id.* at 958.

*4 Thus, in order for a reasonable jury to find a defendant guilty when the only evidence linking the defendant to the crime is a fingerprint on a highly movable item, the Government must establish that (1) the object on which the fingerprint was found was connected to the crime; and (2) the object was inaccessible to the defendant prior to the crime, such that fingerprint "could *only* have been impressed during the commission of

support the conclusion that the cigarette pack was taken by the robber from behind the Circle K counter and dropped as he fled the scene.

**B. Imprinting During the Crime**

**\*5** Regardless of whether the inferences offered by the Government support a finding beyond a reasonable doubt that the cigarette pack was connected to the robbery, it does not necessarily follow that Bratten's fingerprint was actually imprinted during the robbery. In *Strayhorn*, for example, there was no dispute that the duct tape had been handled by a robber during the commission of the crime, but it did not necessarily follow that the particular print recovered had been impressed by the defendant in the course of the offense. *See Strayhorn*, 743 F.3d at 923; *see also Corso*, 439 F.2d at 957 (finding that although a matchbook cover was undisputedly used during the crime, the evidence was insufficient to establish that the defendant's fingerprint found on the cover was impressed during the crime). Under *Corso*, the Government must also establish that the fingerprint "could *only* have been impressed during the commission of the crime," not prior to the robbery or after it was dropped by the robber. *Corso*, 439 F.2d at 957.

Courts have repeatedly made clear that the Government, as part of its burden of proof, is required to present sufficient evidence to establish that the item on which the fingerprint was found was inaccessible to the defendant prior to the crime, even under circumstances that pointed to the defendant's guilt. *See Strayhorn*, 743 F.3d at 923-24. For example, in *United States v. Lonsdale*, 577 F.2d 923, 927 (5th Cir. 1978), the court found that the presence of the defendant's fingerprint on a check issued to a Navy employee was insufficient to establish that the defendant was guilty of uttering the check, even though the defendant worked on the same Navy base and the check had been cashed using his name and social security number, because there had been no evidence presented that the defendant could not have touched the check for other reasons during the seven days between its issuance to the victim and its fraudulent negotiation. *Id.* at 926-27; *see also Hiet v. United States*, 365 F.2d 504, 505 (D.C. Cir. 1966) (finding that the presence of the defendant's fingerprint on the inside of the window of a car that had been broken into was insufficient to sustain a conviction when the Government failed to eliminate the possibility that the defendant had touched the window while passing by in the days before the crime).

Courts have found evidence of inaccessibility insufficient even where access to the object appears to have been significantly restricted. In *Van Fossen*, the items containing the defendant's fingerprints were kept in an unlocked safe inside a print shop, but no evidence was offered to establish that the items were "previously unavailable" to individuals with legitimate business in the store. *Van Fossen*, 460 F.2d at 41. In *Borum v. United States*, 380 F.2d 595 (D.C. Cir. 1967), the court granted a motion for judgment of acquittal in a burglary case where the defendant's fingerprints were found on glass jars which had contained coins stolen by the burglar. *Id.* at 596. Even though the jars were in a private home to which the defendant did not have access, the court concluded that the evidence did not support a guilty verdict because the Government's fingerprint expert had testified that the fingerprints could have been on the jars "indefinitely" or for a period of "years," and the Government had not presented evidence to establish that the glass jars had been inside the house or otherwise inaccessible to the defendant during that entire time period. *Id.*

Likewise, in *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), the court overturned a conviction where the defendant's fingerprints were found on the murder weapon, consisting of a post that had been stored in the victim's basement for four months prior to the crime, because the Government did not establish that they were "previously inaccessible" to the defendant, such as at the hardware store before they were purchased by the victim. *Id.* at 358-60. The court rejected the notion that the defendant needed to explain how his fingerprints came to be on the post; rather, it held that the Government failed to meet its burden to prove that the post had been inaccessible to the defendant. *Id.* at 359.

**\*6** The type of evidence required to establish inaccessibility is illustrated by *Stevenson v. United States*, 380 F.2d 590 (D.C. Cir. 1967), in which that court held that a jury could reasonably find that the defendant's fingerprint on a tea canister in a burglarized house was imprinted during the crime because there was testimony that the canister had been in the house for three years, the print was made within the last two years, and the defendant had never been given access to the house. *Id.* at 592-93; *id.* at 594-95 (Bazelon, C.J.,

evidence based in part on multiple fingerprints on three different objects). They have also found sufficient evidence when the fingerprint was on a stationary object in a restricted area, rather than a movable object "easily and routinely passed from person to person." *Bryant*, 454 F.2d at 250; *see also Stevenson*, 380 F.2d at 591 (finding sufficient evidence based in part on the defendant's fingerprint on a piece of furniture in a private home that had been burglarized). Those situations are not present here, and the Government has notably offered no example of a case where a single fingerprint on a highly movable object has been sufficient to sustain a conviction.

The Court's conclusion is bolstered by the Government's utter failure to offer additional evidence linking Bratten to the crime. Notably, in numerous cases in which the court granted or upheld motions for judgment of acquittal based on the insufficiency of fingerprint evidence, the Government had nevertheless offered some other evidence relating to the defendant. *See Strayhorn*, 743 F.3d at 923 (noting that the defendant was found driving a car containing a firearm stolen during the alleged crime); *Borum*, 380 F.2d at 597 (noting that the Government presented evidence that the defendant was within one-and-a-half miles of the scene of the robbery); *Lonsdale*, 57 F.2d at 927 (noting that the defendant's name and social security number were used to endorse the uttered check). Here, the Government introduced no evidence of any kind relating to Bratten other than his fingerprint. The only possible corroborating evidence was the surveillance video, but the Government appropriately did not attempt to argue that Bratten resembled the robber, because such a comparison would have amounted to little more than the fact that both are African American males of average height and build. Although it referenced the fact that the robber carried the gun in his left hand, the video was inconclusive on whether the robber touched any cigarette packs with his right hand, and the Government presented no evidence on whether Bratten is right-handed or left-handed. To conclude that the evidence was sufficient would run contrary to the Fourth Circuit's holding in *Strayhorn* that "a fingerprint on an easily movable object with no evidence of when it was imprinted is sufficient to support a conviction only when it is accompanied by additional incriminating evidence." 743 F.3d at 924.

Finally, the Court's conclusion that the evidence was insufficient to support a guilty verdict is solidified by the fact that, as discussed above, the Government's circumstantial evidence linking the cigarette pack to the robbery is far less compelling than the definitive connection of the object to the crime in *Strayhorn* or *Corso*. Although the evidence supported the inference that the cigarette pack had been taken by the robber and dropped during his escape, it did not completely foreclose other possibilities, such as that the pack was dropped by someone else before or immediately after the robbery, or that the robber had received it from another source before the robbery. Particularly when considered in combination with the imperfect evidence connecting the cigarette pack to the robbery, the lack of evidence that the cigarette pack was inaccessible to Bratten necessitates the conclusion that the Government failed to offer sufficient evidence to prove beyond a reasonable doubt that Bratten committed the Circle K robbery. Thus, judgment of acquittal must be entered on Counts Two and Three.

*8 Without sufficient evidence to prove that Bratten committed the Circle K robbery, there is no evidence linking Bratten to the Shell robbery at issue in Count One. Therefore, the Court will grant the Motion as to all Counts. Having granted the Motion in its entirety, the Court declines to address Bratten's remaining arguments.

## CONCLUSION

For the foregoing reasons, the Motion for Judgment of Acquittal, ECF No. 147, is GRANTED. A separate Order shall issue.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3117541

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

THOMSON REUTERS
Thomson Reuters is not providing legal advice